Limojwa NITOL, et al.

v.

The UNITED STATES.

No. 543–81L.

United States Claims Court.

Feb. 14, 1985.

William P. Camusi, Los Angeles, Cal., for plaintiffs; Anibar Timothy, Majurd, Mich., Jeffrey Jefferson, Kenai, Alaska, Robert Cowan, Kenai, Alaska, Cowan, Gillespie & Jefferson, Valdez, Alaska, F. Scott Baldwin, Jones, Jones, Baldwin, Curry & Roth, Inc., Marshall, Tex., Frederick Baron, Baron & Cowley, Dallas, Tex., Richard C. Voorhies, Sherman Oaks, Cal., Edwin C. Martin, Jr., Gordon A. Stemple, Stemple & Boyajian, Los Angeles, Cal., and Richard Gerry, Casey, Gerry, Casey, Westbrook, Reed & Hughes, San Diego, Cal., of counsel.

Lois J. Schiffer, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant; Wendy B. Jacobs, Dept. of Justice, Washington, D.C., of counsel.

## MEMORANDUM OF DECISION

HARKINS, Judge.

These 12 consolidated cases are the remaining claims filed in the United States Court of Claims on behalf of the inhabitants of the Marshall Islands as a result of the United States nuclear testing program in those islands during the period June 30, 1946, until August 18, 1958. The cases are before the court on defendant's motion to dismiss filed May 13, 1983. The Memorandum of Decision filed October 5, 1984, in *Juda v. United States,* 6 Cl.Ct. 441 (1984), a related case, contains general information about the procedural posture of all of the Marshall Island claims, the nuclear testing program, and the status of United States political relationships in Micronesia. A Memorandum of Decision was filed November 30, 1984, in another related case, *Peter v. United States,* 6 Cl.Ct. 768 (1984). The general information in the *Juda* case, 6 Cl.Ct. at 443–45, applies to the claims in these 12 consolidated cases.

The complaints in these consolidated cases also assert the detonation of 12 nuclear devices at Johnston Island, from July 1958 through June 1962, was part of the United States nuclear testing program on which the claims are based. Johnston Island is located 1,000 miles east of the Marshall Islands. Politically, it is not part of the Marshall Islands, or of the United Nations Trust Territory of the Pacific Islands. Plaintiffs do not show how the Johnston Island tests produced any effect that has a bearing upon their claims.

*Limojwa Nitol, et al. No. 543–81L*

In the *Nitol* series of cases, 11 complaints were filed simultaneously on September 9, 1981 (Nos. 543–81L through 553–81L); the twelfth case, No. 372–82L, was filed July 26, 1982. At the close of oral argument on August 2, 1983, unlike in the *Juda* and *Peter* cases, a final decision on the motion to dismiss was not indicated for the *Nitol* cases. Decision then was reserved because the initial complaints were unclear as to the basis for an alleged implied-in-fact contract.

On August 9, 1983, in all cases, plaintiffs filed first amended complaints. On August 15, 1983, defendant filed a supplement to its motion to dismiss; and on August 25, 1983, plaintiffs filed a supplement to their response. For purposes of defendant's motion to dismiss, the facts alleged in the first amended complaints filed August 9, 1983, are taken as true.

In each of the 12 cases, the complaints allege that the plaintiffs are citizens of the Trust Territory of the Pacific Islands and of the Marshall Islands. Each complaint alleges that the plaintiffs hold certain ownership rights under Marshallese custom in the particular atoll or island involved. All of the complaints allege that the United States unlawfully has taken and has damaged plaintiffs' properties, and has assumed and breached fiduciary duties owed to plaintiffs.

Structurally, the 12 amended complaints follow a common pattern. Many paragraphs are identical, with changes only as

required to designate the name of the particular atoll or island involved. Four paragraphs in each complaint are different because they contain information peculiar to a particular group: paragraph No. 3 identifies and describes the plaintiffs; paragraph No. 6 describes the location, size and population of the particular plaintiff; paragraph No. 17 alleges radiological fallout has been studied on certain atolls and islands and describes the removal of populations of three atolls; and paragraph No. 21 alleges defendant has recognized radiation contamination in certain places, and describes its extent.

The following chart sets forth information alleged in paragraph 6 of the complaints:

| Case No. & Name | Atoll | Population | Area * |
|---|---|---|---|
| 543–81L Limojwa NITOL, et al. | Maloelap | 500 | 75 Islets; Dry Land Area—3.79 sq. miles; Lagoon Area—375.57 sq. miles |
| 544–81L Manini KABUA, et al. | Ailinginae | ** | 25 Islets; Dry Land Area—1.08 sq. miles; Lagoon Area—40.91 sq. miles |
| 545–81L Manini KABUA, et al. | Wotho | 202 | 18 Islets; Dry Land Area—1.67 sq. miles; Lagoon Area—36.65 sq. miles |
| 546–81L Anjua LOEAK, et al. | Rongerik | ** | 14 Islets; Dry Land Area—0.65 sq. miles; Lagoon Area—55.38 sq. miles |
| 547–81L Manini KABUA, et al. | Ujae | 378 | 15 Islets; Dry Land Area—0.72 sq. miles; Lagoon Area—71.79 sq. miles |
| 548–81L Limojwa NITOL, et al. | Utirik | 548 | 10 Islets; Dry Land Area—0.94 sq. miles; Lagoon Area—22.29 sq. miles |
| 549–81L Manini KABUA, et al. | Rongelap | 426 | 61 Islets; Dry Land Area—3.07 sq. miles; Lagoon Area—387.77 sq. miles |
| 550–81L Limojwa NITOL, et al. | Taka | ** | 6 Islets; Dry Land Area—0.22 sq. miles; Lagoon Area—35.96 sq. miles |
|  | Bikar | ** | 7 Islets; Dry Land Area—0.19 sq. miles; Lagoon Area—14.44 sq. miles |
|  | Jemo Isl. | ** | Dry Land Area—0.06 sq. miles |
|  | Bokaak | ** | 10 Islets; Dry Land Area—1.25 sq. miles; Lagoon Area—30.13 sq. miles |

| | Erikub | ** | 16 Islets; Dry Land Area—0.59 sq. miles; Lagoon Area—88.92 sq. miles |
|---|---|---|---|
| 551–81L Likbar ANNI, et al. | Mejit Isl. | 150 | Dry Land Area—0.72 sq. miles |
| 552–81L Limojwa NITOL, et al. | Wotje | 350 | 75 Islets; Dry Land Area—3.16 sq. miles; Lagoon Area—241.06 sq. miles |
| 553–81L Manini KABUA, et al. | Lae | 314 | 20 Islets; Dry Land Area—0.56 sq. miles; Lagoon Area—6.82 sq. miles |
| 372–82L R. Limojwa LANITTOL, et al. | Ailuk | 450 | 55 Islets; Dry Land Area—1284.48 sq. miles; Lagoon Area—68.47 sq. miles |

Total population asserted: 3,318
\* all areas approximate
\** uninhabited

The allegations applicable to all complaints assert that at the end of World War II, the United States government knew about the acute medical danger of nuclear radiation to human beings. In order to resolve questions as to the actual nature, effect and force of nuclear weapons, the United States government planned a program for controlled tests to study such effects on naval vessels. The tests should be held overseas until it could be established more definitely that continental detonations would not endanger the public health and safety. The search required the location of a site which would satisfy the following conditions: control by the United States, an uninhabited or sparsely populated area far from United States population centers, and a large, shallow lagoon suitable for anchoring target vessels.

In January of 1946, the United States Joint Chiefs of Staff selected Bikini Atoll for the first test, Operation Crossroads, and this choice was approved by the President. The United States detonated 23 atomic and hydrogen bombs at Bikini Atoll between June 30, 1946, and July 22, 1958, and during that same period, detonated 42 nuclear devices at Enewetak Atoll. The largest test was the 1954 detonation of an experimental thermonuclear device, "Bravo". Between 1958 and 1962, 12 additional nuclear devices were detonated at Johnston Island. The testing at Bikini, Enewetak and Johnston Island allegedly was a critical part of the United States nuclear weapon development.

With the exception of Bikini and Enewetak, the United States has maintained that no permanent radiation damage has been done to any of the atolls. Through the years, the United States made radiological surveys of various of plaintiffs' atolls, at differing periods of time. The United States has represented, orally and in writing, that either there was no evidence of radiological contamination, or that such contamination was of such slight degree

that it was of no significance. The Marshallese people, represented by plaintiffs, questioned United States assurances that radiation did not constitute a threat to their health or welfare and demanded a radiation survey.

In 1978, the United States agreed to perform a radiation survey of Bikini Atoll, Ujelang Atoll, Wotho Atoll, Rongelap Atoll, Likiep Atoll, Ailinginae Atoll, Rongerik Atoll, Taka Atoll, Utirik Atoll, Ailuk Atoll, Bikar Atoll, Mejit Island, and Jemo Island. As a result from September to November 1978, an aerial survey was made of terrestrial plant and marine life. Following the survey, the United States has represented that there was no radiation, or that the radiation was within normal guidelines and was of such an insignificant amount as to present no threat to health or safety, and that, in no event, was the level of radiation as great as that existing in the United States.

Plaintiffs assert that the surveys made by the United States were negligently and incompetently conducted, were incomplete, and that the United States has underestimated the amount and severity of the radiation existing in the Marshall Islands. United States representations that it has made thorough and competent surveys are said to be fraudulent. Such representations either were intentionally made with the knowledge that they are not true, or were recklessly made with knowledge that the United States does not have sufficient information upon which to base its representations. The United States agents and agencies have concealed from the people of the northern Marshall Islands the fact of the existence of radiation contamination to an extent that adversely affects their health and safety.

Radiation in the northern Marshall Islands on the lands involved in the complaints assertedly is at a level which threatens the health of those living there, or those who eat food obtained from that area. Radiological contamination and fallout have so damaged the atolls and islands of the plaintiffs that they are now not fit for human habitation, nor for use to provide agricultural products, animal or marine life. Plant and fish life have been adversely affected by radiation contamination. The health of the people using the atoll and islands and those who have eaten of its plant, fish or animal life, has been adversely affected. Further, the contamination will exist for many years in the future.

Plaintiffs assert that there never has been a competent, independent testing of the lands and waters for a determination of the exact or approximate level of radiation contamination, and the nature and extent of the danger it presents to the owners, inhabitants or users of the atolls or islands. Independent, qualified testing for radiation levels is necessary both to preserve plaintiffs' property rights and to preserve their health.

Plaintiffs allege they reasonably have believed the representations made by the United States and have relied upon such representations to their detriment. Had plaintiffs known the true extent and severity of the low level radiation contamination they either could have removed themselves, or could have remained absent, from contaminated atolls and islands.

The facts alleged in the complaints are based upon an investigation conducted after February 1978. At that time, a group of Marshallese people living on Ebye Island in the Kwajalein Atoll approached an American lawyer, who was there on an official tour of duty, and advised him that, notwithstanding defendant's representations, they were concerned about presently occurring illnesses that were believed to be radiation induced.

During the course of the testing program, plaintiffs on three of the atolls were relocated by the United States because of the hazard of radioactive fallout. Prior to the ABLE test in Operation Crossroads in 1946, the United States moved the inhabitants of Wotho Atoll to Lae Atoll (No. 545–81L, *Kabua et al.*). They were returned to Wotho Atoll after several months.

In February 1954, 3 days after the "Bravo" test, the inhabitants of Utirik Atoll were moved to Kwajalein Atoll (No. 548–81L, *Nitol et al.*). They were returned after several months.

In 1946, prior to the ABLE test, the inhabitants of Rongelap were moved to a tent camp on Lae Atoll (No. 549–81L, *Kabua et al.*). They were returned shortly thereafter. In 1954, 2 days after the "Bravo" test, the inhabitants of Rongelap Atoll again were moved. They were not returned until 1957.

The 1978 radiation survey performed by the United States confirmed the existence of radiation contamination at eight atolls and islands. The atolls and islands on which the United States has recognized some degree of contamination, and its source, are shown on the following chart:

| Case No. | Atoll | Fallout Source |
|---|---|---|
| 544–81L | Ailinginae | Bikini— Bravo, Feb. '54 |
| | | — Union, Apr. '54 |
| | | — Yankee, May '54 |
| | | — Maple, June '58 |
| | | Enewetak—Zebra, May '48 |
| 545–81L | Wotho | Bikini— Bravo, Feb. '54 |
| | | — Maple, June '58 |
| 546–81L | Rongerik | Bikini— Bravo, Feb. '54 |
| | | — Union, Apr. '54 |
| | | — Yankee, May '54 |
| | | Enewetak—Zebra, May '48 |
| 548–81L | Utirik | Bikini— Bravo, Feb. '54 |
| 549–81L | Rongelap | Bikini— Bravo, Feb. '54 |
| | | — Union, Apr. '54 |
| | | — Yankee, Apr. '54 |
| | | Enewetak—Zebra, May '48 |
| 550–81L | Taka | Bikini— Bravo, Feb. '54 |
| | Jemo Island | Bikini— Bravo, Feb. '54 |
| | Bikar | Bikini— Bravo, Feb. '54 |
| | | — Yankee, May '54 |
| 551–81L | Mejit Island | Bikini— Bravo, Feb. '54 |
| 372–82L | Ailuk | Bikini— Bravo, Feb. '54 |

No radiation contamination survey has been conducted with respect to the atolls and islands in the following cases:

| Case No. | Atoll |
|---|---|
| 543–81L (Nitol, et al) | Maloelap |
| 547–81L (Kabua, et al) | Ujae |
| 550–81L (Nitol, et al) | Bokaak and Erikub |
| 552–81L (Nitol, et al) | Wotje |
| 553–81L (Kabua, et al) | Lae |

· Each of the complaints in the *Nitol* cases lists three causes of action: (I) an unlawful taking of plant life, fish life, fishing rights, the land, the lagoon, the waters of the lagoon, and surrounding ocean of the atoll or island; (II) breach of an implied-in-fact contract between the people of the Marshall Islands and the United States that obligated the United States as a fiduciary to protect the health, well being and economic condition of the Marshallese people; and (III) breach of fiduciary duties arising out of the Trusteeship Agreement, which is characterized as a bilateral contract between the United States and United Nations.

Defendant's motion to dismiss is based upon three grounds: (1) plaintiffs' claims in each cause of action are barred by the statute of limitations; (2) the United States has not waived its sovereign immunity as to plaintiffs' claims in II and III; and (3) plaintiffs have failed to state a claim in I, II and III upon which relief may be granted.

*Statute of Limitations*

Any claim that is not filed within 6 years after such claim "first accrues" is barred in this court by the statute of limitations, 28 U.S.C. § 2501 (1982). In these cases, 11 complaints were filed simultaneously on September 9, 1981, and the remaining case was filed July 26, 1982. Accordingly, this court does not have jurisdiction with respect to any claim that accrued prior to September 9, 1975, or, with respect to No. 372–82L (*Lanittol et al.*), July 26, 1976.

Plaintiffs' taking claims are based upon low level radiation contamination of the lands, the lagoons, and the surrounding waters of the atolls and islands. The complaints assert radioactive contamination from the United States atomic tests have made their islands and atolls unfit for human habitation and that the health of the people using the atolls and islands has been adversely affected.

Unlike the effects of the nuclear testing program at Bikini and Enewetak Atolls, there was no direct or observable destruction of any of the atolls or islands involved in these cases. The taking is the result of alleged contamination by radiation from nuclear fallout produced in the tests. The contamination physically is unobservable, but assertedly is now present and will continue for an uncertain period in the future.

The complaints do not specify a particular date on which the alleged takings occurred. Plaintiffs counter defendant's limitations contention with the argument that the uncertain nature of low level radiation contamination makes the taking insidious, and the statute was tolled until they first learned the true facts about the severity of the contamination. Plaintiffs assert they relied upon representations made by the United States that the radiation was insignificant, and that, because the United States either through error or by deliberate concealment, created a situation where plaintiffs reasonably could not ascertain the extent of the danger involved until an investigation was conducted after February 1978. Plaintiffs rely upon the doctrine that a taking does not accrue if the extent or duration of the taking is unknown, and that the running of the statute of limitations will be suspended when an accrual date is ascertained, but injury from defendant's conduct has been concealed. *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947); *Castro v. United States*, 500 F.2d 436, 205 Ct.Cl. 534 (1974); *Spevack v. United States*, 390 F.2d 977, 182 Ct.Cl. 884 (1968).

Defendant contends that if there has been any taking, the taking must have occurred by 1962 at the latest. Defendant reasons that the nuclear testing program was the source of the fallout and any resultant radiation contamination; since radiation is what affected the alleged taking, plaintiffs' claims must have accrued at the end of the testing program; after 1962, no further actions were taken by the United States which contributed to the radiation danger. Plaintiffs who had been removed from their atolls knew about the testing program and the dangers from fallout radiation, and other plaintiffs were on notice of the fact of nuclear testing and radiation

exposure. The statute of limitations, defendant says, is triggered at the time of initial contamination and any error or concealment pertained to the extent of contamination, not to the time of injury. Defendant cites cases that state a taking claim accrues (1) the moment the consequences of the government's actions so manifest themselves that a final account can be struck, or (2) when the government enters into possession of plaintiffs' property, or (3) when the government's actions result in a physical invasion of plaintiff's property, or (4) on the date the government's actions amount to a substantial interference with the owner's use and enjoyment of the property. *United States v. Clarke*, 445 U.S. 253, 258, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980); *United States v. Dow*, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958); *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947); *Kabua, Kabua v. United States*, 546 F.2d 381, 212 Ct.Cl. 160 (1976), *cert. denied*, 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977).

In the *Nitol* series of cases, unlike the claims relative to Bikini and Enewetak, there is a question whether in fact there has been any taking. According to the complaints, the United States has conducted radiation surveys on eight atolls and islands, which in 1978 confirmed that radiation was present. After the surveys, the United States asserted any radiation contamination was within normal guidelines, was of such an insignificant amount as to present no threat or danger, and was no greater than that existing in the United States. The complaints, however, charge that the surveys were incompetently made and that plaintiffs' studies show that the amount and severity of the radiation existing in plaintiffs' atolls and islands are at levels which threaten the health of the people living there and are far more intense then has been represented by defendant.

■ Factual allegations in the complaints relative to the taking claims are general and conclusory. Although presently occurring illnesses believed to be radia-

tion induced are noted, the complaints do not allege deleterious effects of low level radiation with respect to specific individuals, atolls or islands, nor do they cite examples of adverse effects on particular lands, waters, or plant or animal life. In none of these cases is it alleged that the plaintiffs are not now, and have not since 1957, been living at their homes. Notwithstanding these deficiencies, the complaints are adequate to give notice of the claim asserted, and the facts alleged, if accepted as true, are sufficient to state a Fifth Amendment taking claim.

■ A claim for just compensation in a taking case by inverse condemnation is uniquely fact intensive. Denial of a taking claim on the basis of the defense of limitations is warranted only where the facts alleged demonstrate conclusively that such decision is required as a matter of law. *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed.Cir.1983). Defendant's motion to dismiss in these cases, insofar as based on the bar of limitations, raises factual issues that involve both the nature and extent of the alleged taking and the time when plaintiffs should have been on inquiry that their claims had accrued.

In *Dickinson*, the Supreme Court stated that property is taken in a constitutional sense "when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in a course of time." 331 U.S. at 748, 67 S.Ct. at 1384. Other cases define the period when limitations begin to run as the date the government's actions result in the physical invasion of plaintiff's property, or on the date the government's actions amount to a substantial interference with the owner's use and enjoyment of the property. *United States v. Clarke*, 445 U.S. at 258, 100 S.Ct. at 1130; *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); *Eyherabide v. United States*, 345 F.2d 565, 170 Ct.Cl. 598 (1965).

■ The United States nuclear testing program in the Marshall Islands involved a continuing process of physical events that

make it reasonable to apply the doctrine enunciated in *Dickinson* and developed in its progeny. The testing program consisted of an intermittent sequence of events over an extended period of time, and was of uncertain duration until terminated by Presidential order. In such a sequence, the fact of any taking and the consequences thereof would not be manifest so that a final account could be struck until the program terminated. A taking based on radioactive fallout necessarily must have occurred when all testing in the Marshall Islands ceased in 1958. As of that date, such contamination as may have occurred was completed.

■ For misrepresentation and concealment to toll the statute, the facts alleged must show the United States concealed from plaintiffs the fact of the existence of unacceptable levels of radiation contamination, and that plaintiffs acted within the statutory period from the time they learned, or reasonably should have learned, of the true facts. Both parties cite the limitations standards described in *Japanese War Notes Claimants Assn. v. United States*, 373 F.2d 356, 358–59, 178 Ct.Cl. 630, *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). There the Court of Claims allowed a motion to dismiss a petition filed in 1964 to seek reimbursement for millions of counterfeit Japanese war notes circulated by the Allied Forces in the Philippines during the Japanese occupation because information in 1946 and 1947 that could be judicially noticed was sufficient to place plaintiff on inquiry that it had a potential claim. That case, on its facts, is inapposite for analysis of plaintiffs' claims.

■ Plaintiffs' complaints allege defendant misrepresented or concealed the extent of radioactive contamination and that plaintiffs were unaware of its existence. Those factual allegations, for disposition of this motion, are taken as true. In the absence of sophisticated testing that was unavailable to plaintiffs, the existence of low level radiation caused by nuclear fallout inherently was unknowable at the taking date.

Although the amended complaints provide only minimal factual allegations relative to when plaintiffs became aware of the radiation hazard, and its degree, they are sufficient to overcome defendant's motion to dismiss. As to the atolls and islands where no radiological survey has been made, plaintiffs had a right to rely on the representations of the United States and its agents. For people in the position of plaintiffs on the atolls and islands that were surveyed, in the face of the representations alleged, it would not be unreasonable for them to accept that radiation hazards were minimal, until they were faced with recurring illnesses that appear to be radiation induced.

Accordingly, defendant's motion to dismiss must be denied as to cause of action I insofar as based upon the bar of the statute of limitations.

*Failure to State a Claim*

Defendant also argues that the taking claims in cause of action I should be dismissed on the ground that Congress has not extended the just compensation clause of the Fifth Amendment to property that is located in the Trust Territory of the Pacific Islands and is owned by Micronesians who are not citizens of the United States. Plaintiffs counter with and rely upon decisions of the Court of Claims that have considered United States takings of property in Micronesia, and elsewhere outside U.S. boundaries. Plaintiffs cite: *Porter v. United States*, 496 F.2d 583, 204 Ct.Cl. 355 (1974); *Fleming v. United States*, 352 F.2d 533, 173 Ct.Cl. 426 (1965); *Seery v. United States*, 127 F.Supp. 601, 130 Ct.Cl. 481 (1955); *Turney v. United States*, 115 F.Supp. 457, 126 Ct.Cl. 202 (1953).

■ The question of whether an allegation of a taking by the United States of property owned by Marshall Islanders in the Trust Territory of the Pacific Islands states a cause of action within the jurisdiction of this court has not been decided, either by the Court of Claims or by the Court of Appeals for the Federal Circuit. The applicable cases, and an analysis of the

legal principles involved, were discussed in detail in the Memorandum in the *Juda* case, 6 Cl.Ct. at 455–458. It was there concluded that the just compensation clause of the Fifth Amendment would extend to include a taking that resulted from the United States nuclear testing program in the Marshall Islands. Accordingly, the allegations in cause of action I of the complaints state a cause of action within the jurisdiction of this court.

Cause of action II in the complaints states that the United States assumed fiduciary responsibilities for the people of the Marshall Islands when it began its nuclear testing program, and that, by the initiation of the program, an implied-in-fact contract between the Marshallese people and the United States was created. This contractual relationship allegedly obligated the United States as a fiduciary to protect the health, well being and economic condition of the Marshallese people. The elements of the contract were: in consideration of the Marshallese people cooperating with the United States in the testing program by assuming the risk of personal injury and destruction of their personal property, the United States would protect the health of the person of the Marshallese people and their properties. The implied-in-fact contract is claimed to be a natural outgrowth of the policy of the United States enunciated by Admiral Nimitz in Proclamation No. 1 in the 1944 invasion. That proclamation notified the Marshallese that existing personal and property rights would be respected and existing laws and customs would remain in effect, except to the extent that war conditions made it necessary to change them.

The implied-in-fact contract's terms allegedly were manifested by acts to relocate people considered to be in areas of potential fallout contamination, and the provision, at the sole expense of the United States, of transportation, food, shelter and clothing to people who were involved in such movements. These actions were reinforced by representations to the Marshallese people that they would be protected from radiological contamination, that

medical teams would be maintained and that surveys would be made for the detection of radiological contamination. Further, when some Marshallese people in fact did incur lesions to their bodies and cancerous thyroid glands, the United States furnished medical care and surgical intervention where necessary.

The implied-in-fact contract assertedly arose before the Trusteeship Agreement came into being in 1947 and exists independently of that Agreement. The Trusteeship Agreement, however, is said to memorialize the fiduciary responsibilities of the United States.

▆▆▆▆ This court's Tucker Act jurisdiction includes contracts which are implied-in-fact. 28 U.S.C. § 1491(a)(1) (1982). *Russell Corp. v. United States,* 537 F.2d 474, 210 Ct.Cl. 596 (Ct.Cl.1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). Although a contract implied-in-fact is based on conduct, it requires a showing of the same contractual elements as that required to establish an express contract. The requirements of mutuality of intent and lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs. *Fincke v. United States,* 675 F.2d 289, 295, 230 Ct.Cl. 233 (1982); *Algonac Mfg. Co. v. United States,* 428 F.2d 1241, 1255, 192 Ct.Cl. 649 (1970). The representatives of the United States whose conduct is relied upon must have actual authority to bind the government in contract. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Jascourt v. United States,* 521 F.2d 1406, 207 Ct.Cl. 955, *cert. denied,* 423 U.S. 1032, 96 S.Ct. 562, 46 L.Ed.2d 405 (1975).

▆▆▆▆ Implied-in-fact contracts differ from contracts implied-in-law (quasi contracts), where a duty is imposed by operation of law without regard to the intent of the parties. Such arrangements are treated as contracts for purposes of remedy only. The Claims Court has no jurisdiction to render judgment against the United

States based upon a contract implied-in-law. *Putnam Mills Corp. v. United States,* 479 F.2d 1334, 1337, 202 Ct.Cl. 1 (Ct.Cl.1973); *Algonac Mfg. Co. v. United States,* 428 F.2d at 1256.

■■■ Defendant protests that the amended complaints do not allege the elements required to establish an implied-in-fact contract. Defendant is correct. The amended complaints do not refer to facts that are specific to plaintiffs. The contracting entities allegedly are the United States on the one hand and the people of the Marshall Islands, generally as the other party. The allegations in the complaints do not show conduct that satisfies the requirements of mutuality of intent and a lack of ambiguity in offer and acceptance with respect to any plaintiff. The initiation and conduct of the nuclear testing program, and the provision of relocation, medical and other services, without more, are not sufficient to establish an implied-in-fact contract to assume the fiduciary duties alleged.

Proclamation No. 1 of Admiral Nimitz was posted in 1944, 2 years before the conduct which plaintiffs assert is the basis for the implied-in-fact contract. The proclamation evidences a policy as to how the United States intended to deal with inhabitants of war occupied islands and atolls. That policy cannot be stretched to the extent plaintiffs contend without substantially greater factual refinement. Provision of medical services and other assistance do not amount to a contract to undertake fiduciary responsibilities on the facts alleged. These actions are consonant with contributions ex gratia or with the moral obligations assumed by the United States in the Trusteeship Agreement to provide care for inhabitants of the Trust Territory.

The amended complaints allege facts that are consonant with criteria applicable to a claim for an implied-in-law contract based on moral obligations. Plaintiffs argue that even to suggest that the United States would begin and carry on its nuclear test program without obligating itself to the health and safety of the Marshallese people and their property is repugnant to every

principle for which the United States and its people stand. Plaintiffs then go on to assert that under modern law a moral obligation, as opposed to a legal one, is a distinction without substance. Plaintiffs further contend that the allegations of the complaints are such that, if it be found upon a trial of the facts that there was no immediate implied-in-fact contract, the allegations support a contention that at some point in time there arose an implied-in-fact contract between the United States and all of the Marshallese. The United States, according to plaintiffs, could not undertake the destruction and contamination of lands in their protective custody, and at the same time escape, in the Twentieth Century, an undertaking to reimburse the peoples of those lands. Plaintiffs recognize that these arguments, on the facts alleged, are the basis for an implied-in-law contract.

In cause of action II, plaintiffs fail to take into account the limited jurisdiction of this court relative to claims against the United States based on contracts. The Tucker Act jurisdiction of the court in 28 U.S.C. § 1491(a)(1) does not apply to claims that are founded on the type of moral obligations recognized in implied-in-law contracts. Compensation for such claims must be found in another forum.

During argument on the *Nitol* series of cases on August 2, 1983, it was pointed out that plaintiffs' first complaints had failed to delineate facts that established an implied-in-fact contract, and that it was not clear when the alleged fiduciary relationship came into existence. These deficiencies were not cured when plaintiffs subsequently filed their amended complaints. Inasmuch as plaintiffs in the amended complaints could develop facts that reflect at best only a contract implied-in-law, further consideration of cause of action II is not warranted. Defendant's motion to dismiss cause of action II will be allowed.

In cause of action III, the complaints state that the Trusteeship Agreement entered July 18, 1947, constitutes a bilateral contract between the United States and the United Nations under which the United

States agreed to act as a trustee for the benefit of the people of the Trust Territory, including plaintiffs. Plaintiffs' claims in cause of action III are based upon an alleged failure of the United States to discharge the obligations assumed in the Trusteeship Agreement.

Congress has declared that the United States Claims Court shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations. 28 U.S.C. § 1502 (1982). The Court of Claims noted that the Trusteeship Agreement does not add anything to the court's jurisdiction, and recognized it as a treaty under 28 U.S.C. § 1502. *Kabua, Kabua v. United States,* 546 F.2d at 385.

The rationale for 28 U.S.C. § 1502 lies in the desire to avoid judicial interference with the conduct of foreign relations by the Executive Branch. *Hughes Aircraft Co. v. United States,* 534 F.2d 889, 903, n. 17, 209 Ct.Cl. 446 (1976). The United Nations is a group that includes foreign nations. Plaintiffs allege the Trusteeship Agreement is not a treaty and argue the allegation must be taken as true. Such an allegation is a legal conclusion, not a fact that must be recognized for purposes of this motion to dismiss. Although the United Nations is an international organization with its own legal personality and the United States' relationship with the United Nations differs markedly from its relationship with foreign nations, these characteristics do not restrict the scope of 28 U.S.C. § 1502.

 The Trusteeship Agreement is a treaty, and it has been made with a recognized unit of foreign nations. Plaintiffs' claim in cause of action III clearly grows out of and is dependent upon that treaty. Plaintiffs' claims in cause of action III have no existence that is separate and apart from the Trusteeship Agreement. Such relationship bars jurisdiction in this court. *Hughes Aircraft Co. v. United States,* 534 F.2d at 903; *S.N.T. Fratelli Gondrand v. United States,* 166 Ct.Cl. 473, 478 (1964).

Accordingly, defendant is entitled to prevail on its motion to dismiss as to the claims alleged in cause of action III of the complaint.

CONCLUSION

On the basis of the foregoing, defendant's motion to dismiss is ALLOWED with respect to causes of action II and III of the complaints, and is DENIED with respect to the claims in cause of action I. Defendant will file its answers to cause of action I of the complaints 30 days from this date.