Abdi Hosh **ASHKIR**, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 96–351L.

United States Court of Federal Claims.

April 4, 2000.

---

Philip Musolino, Washington, DC, for the Plaintiff.

Alan Brenner, U.S. Department of Justice, Washington, DC, with whom was Assistant Attorney General Lois J. Schiffer, for the Defendant.

### OPINION

ALLEGRA, Judge.

Plaintiff, a citizen and resident of the Republic of Somalia, seeks $190,000,000 in com-

pensation under the Fifth Amendment for the physical occupation and destruction of his property in Mogadishu, Somalia by United States armed forces. Defendant has moved to dismiss this complaint, arguing, *inter alia*, that plaintiff has no standing to assert this claim under RCFC 12(b)(2). Following oral argument and after careful consideration of the parties' filings, this court hereby GRANTS defendant's motion to dismiss.

## I. Facts [1]

In January of 1991, a civil war erupted in Somalia after then national leader General Muhammed Siad Barre was overthrown. In April of 1992, the United Nations Security Council, in response to the growing crisis in Somalia, passed Resolution 751, creating the United Nations Operation in Somalia (UNOSOM I), an effort to provide security for humanitarian relief efforts. The United States participated in UNOSOM I by providing support and transportation for Pakistani troops, relief workers, and supplies.

In December of 1992, as the situation in Somalia deteriorated, the U.N. Security Council passed Resolution 794, authorizing the use of "all necessary means" for the delivery of humanitarian aid in Somalia. Consistent with this resolution, the United States assumed leadership of a Unified Task Force (UNITAF), an international military coalition designed to support the UN's humanitarian goals in Somalia. Advance units of UNITAF landed in the Somalian capital city of Mogadishu on December 9, 1992, and thereafter United States military forces took over plaintiff's compound, which comprises approximately one million square meters in the city center and includes, *inter alia*, a hotel, apartment buildings, villas, sports facilities, restaurants, factory space, warehouses, and independent electric and water services. This property served as headquarters for U.S. and, subsequently, U.N. peacekeeping forces in Somalia, from December 9, 1992, to March 31, 1995. During this period, the

compound was also used by private contractors supporting the military operations and relief efforts, including Brown and Root Services Corporation.

In March of 1993, UNOSOM I was supplanted by UNOSOM II, which, pursuant to U.N. Security Council Resolution 814, was established to maintain the secure environment created by UNITAF. In May of 1993, UNOSOM II formally assumed operations from UNITAF. The United States transferred possession and use of the plaintiff's compound to UNOSOM II. UNOSOM II withdrew from Somalia on March 31, 1995, at which point plaintiff's compound was abandoned.

On June 14, 1996, plaintiff filed suit in this court, seeking $190,000,000 in compensation under the Takings Clause of the Fifth Amendment. Plaintiff alleges that the use of his property constituted a temporary taking and that his property was damaged during this use by the storage and disposal of toxic chemicals On September 3, 1996, defendant filed a motion to dismiss, arguing, under RCFC 12(b)(2), that plaintiff lacks standing to sue on the asserted claims. On January 27, 1999, this case was reassigned to the undersigned judge. On December 20, 1999, with the court's permission and the plaintiff's acquiescence, the defendant submitted an additional memorandum arguing, under RCFC 12(b)(4), that plaintiff's complaint failed to state a claim for which relief can be granted.

## II. Discussion

Plaintiff's claims invoke the Takings Clause of the Fifth Amendment, which provides: "[N]or shall private property be taken for public use, without just compensation." Defendant, however, argues that plaintiff lacks standing to raise these claims because the protections of the Takings Clause may not be asserted by a nonresident alien with respect to foreign property.[2]

---

1. In reviewing the sufficiency of the complaint pursuant to a motion to dismiss, the court must presume that the factual allegations included in the complaint are true. *Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974);

*Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988).

2. Defendant's standing argument, though styled as a motion under RCFC 12(b)(2), does not appear to arise under that subparagraph, which

Various cases have explored whether the Takings Clause reaches abroad to individuals and property in foreign countries. Some cases, for example, hold that a United States citizen may assert a takings claim with respect to property located in a foreign country. *See, e.g., Turney v. United States*, 126 Ct.Cl. 202, 115 F.Supp. 457, 464 (1953) (U.S. citizen as corporate liquidator may assert claim with respect to property in the Phillippines). Others hold that a nonresident alien has standing to assert such a claim with respect to property located within the jurisdiction of the United States. *See, e.g., Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491–92, 51 S.Ct. 229, 75 L.Ed. 473 (1931) (alien corporation may assert claims with respect to property located in the United States). *See also* Remsen M. Kinne, IV, *Making America Pay: Just Compensation for Foreign Property Takings*, 9 B.C. Third World L.J. 217 (1989). This case, however, is somewhat unique as it involves both a nonresident alien *and* property located in a foreign country.

At first blush, one might be tempted to conflate the lines of authority described above and thereby conclude that standing ought to be conferred on nonresident aliens alleging the taking of foreign property. After all, if some cases apply the Takings Clause to nonresident aliens and others to foreign-based property, why should the clause not apply, *a fortiori*, to a nonresident alien whose property is located in a foreign country? A close examination of the rationale of the relevant cases, however, reveals that this syllogism is a *non sequitor*, for these decisions neither hold that the Takings Clause is "residency neutral" nor "fully extraterritorial." Rather, they premise standing on the existence of some substantial connection between the United States and either the claimant or the property involved in a taking claim.

This "substantial connections" requirement derives from a judicial analysis of the Constitution and its history. In some respects, this limitation is the remnant of a doctrine of territoriality that cabined the application of the Bill of Rights in the Nineteenth and early Twentieth Centuries. Under this doctrine, the Constitution's application ended at the water's edge with respect to both citizens and noncitizens alike.[3] This view of the Con-

---

involves personal jurisdiction. It is unclear whether the defendant's standing arguments more properly arise under RCFC 12(b)(1), dealing with subject matter jurisdiction, or RCFC 12(b)(4), dealing with a failure to state a claim. Precedent on this subject is somewhat conflicting. *Compare First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1290 (Fed.Cir.1999) (standing relates to jurisdiction), *with Animal Legal Defense Fund v. Quigg*, 932 F.2d 920, 925 (Fed.Cir.1991) (standing relates to failure to state a claim). *See also Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1517 (D.C.Cir.1984)(discussing this issue), *vacated*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). While the court believes that the better view is that the issues presented arise under RCFC 12(b)(4), *see* 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 12.34[4][a] (1999), its analysis of plaintiff's standing would be the same even if defendant's arguments were more properly viewed as jurisdictional.

Defendant does raise one issue that is clearly jurisdictional. It argues that plaintiff has not met the provisions of 28 U.S.C. § 2502, which require, as a precondition to this court's exercise of jurisdiction, that an alien demonstrate that citizens of the United States would have the right to prosecute claims against the alien's government in his country's courts. *See Pottawatomi Nation in Canada v. United States*, 27 Fed.Cl.

388, 390 (1992). In the instant case, the plaintiff has provided excerpts from the Somalian Constitution, as well as an affidavit from an expert on Somalian law, indicating that a U.S. citizen could sue Somalia in that nation's courts. The fact that Somalia's government is still in a state of disarray does not preclude plaintiff from meeting the requirements of Section 2502. *See Russian Volunteer Fleet v. United States*, 282 U.S. 481, 488, 492, 51 S.Ct. 229, 75 L.Ed. 473 (1931) (indicating that this statutory requirement was met despite the overthrow of the Provisional Russian Government in 1917 and the failure of the United States to have then recognized the Union of Soviet Socialist Republics).

**3.** The adherence to strict territoriality was perhaps most in evidence in the so-called *Insular Cases*, in which the Supreme Court held that the Constitution did not "follow the flag" and thus was largely inapplicable to aliens and citizens in unincorporated territories. *See Balzac v. Porto Rico*, 258 U.S. 298, 309, 42 S.Ct. 343, 66 L.Ed. 627 (1922) (holding the Fifth Amendment right to a jury trial inapplicable, even to a U.S. citizen, in Puerto Rico); *Ocampo v. United States*, 234 U.S. 91, 98, 34 S.Ct. 712, 58 L.Ed. 1231 (1914) (holding the Fifth Amendment grand jury provision inapplicable in the Phillippines). *See also Ross v. McIntyre*, 140 U.S. 453, 464, 11 S.Ct. 897, 35 L.Ed. 581 (1891) (no constitutional

stitution was largely repudiated in *Reid v. Covert*, 354 U.S. 1, 6, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), which held that when the government reaches out to impact a citizen who is abroad, "the shield which the Bill of Rights ... provide[s] to protect [a citizen's] life and liberty should not be stripped away just because he happens to be in another land." The holding in *Reid* was based, in part, on viewing the Constitution as a social compact, embodying the consent of the governed to be governed and viewing those governed as the beneficiaries of that compact.[4] *Id.* at 5–7, 77 S.Ct. 1222. Under this "contractarian" view, the benefits of the compact flow to citizens wherever they are located. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318, 57 S.Ct. 216, 81 L.Ed. 255 (1936) ("[n]either the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens").[5] Moreover, as illustrated by cases such as *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) and *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596–97, 73 S.Ct. 472, 97 L.Ed. 576 (1953), the benefits of the compact also redound to aliens residing within the territory of the United States, who are deemed to owe temporary allegiance to the United States and thereby are entitled to the reciprocal protections of the Constitution. *See United States v. Barona*, 56 F.3d 1087, 1093–94 (9th Cir.1995), *cert. denied*, 516 U.S. 1092, 116 S.Ct. 813, 814, 133 L.Ed.2d 759 (1996).[6]

The Supreme Court's most recent expression of these principles appears in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), where the Court held that the Fourth Amendment did not apply to the warrantless search by American authorities of the Mexican homes of a Mexican citizen and resident. In reaching this conclusion, the Court observed that it had "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." *Id.* at 269, 110 S.Ct. 1056.[7]

---

rights in trial of capital offense by American consul in Japan). As noted by one commentator, these cases "represent[ ] the nadir of the extraterritorial reach of the Constitution." Zachary Margulis–Ohnuma, *The Unavoidable Correlative: Extraterritorial Power and the United States Constitution*, 32 N.Y.U.J. Int'l L. & Pol. 147, 154 (1999).

4. As Chief Justice Jay explained in 1793, "[e]very state constitution is a compact made by and between the citizens of a state to govern themselves in a certain manner; and the constitution of the United States is likewise a compact made by the people of the United States to govern themselves as to general· objects in a certain manner." *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 471, 1 L.Ed. 440 (1793) (Jay, C.J., seriatim opinion). *See generally*, Anita L. Allen, *Social Contract Theory in American Case Law*, 51 Fla. L.Rev. 1 (1999).

5. *See also Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896); *Transportes Aeros Mercantiles Panamericanos, S.A. v. Boyatt*, 562 F.Supp. 707, 709 (S.D.Fla. 1983).

6. Highlighting the importance of residency as a substantial connection, the Supreme Court has long drawn a distinction between the constitutional footing of aliens who are beyond the territorial limits of the United States and those residing either permanently or temporarily within our borders. For instance, while the Supreme Court has held that the Fifth Amendment protections, including that of due process, apply to a resident alien, *Kwong Hai Chew*, 344 U.S. at 596, 73 S.Ct. 472, it has denied the same rights to an alien who has not entered the country's borders, *Nishimura Ekiu v. United States*, 142 U.S. 651, 660, 12 S.Ct. 336, 35 L.Ed. 1146 (1892). *See United States v. Verdugo–Urquidez*, 856 F.2d 1214, 1234–35 (9th Cir.1988) (Wallace, J., dissenting), *rev'd*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). Summarizing cases like these, the Supreme Court, in *Johnson v. Eisentrager*, 339 U.S. 763, 771, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), commented that "in extending constitutional protections beyond citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary the power to act." *See also Plyler v. Doe*, 457 U.S. 202, 212, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Kwong Hai Chew*, 344 U.S. at 596–97 n. 5, 73 S.Ct. 472; *Carlisle v. United States*, 83 U.S. (16 Wall.) 147, 154–55, 21 L.Ed. 426 (1872). Similar sentiments date back at least to 1798, as a constant theme in the vigorous debates between the Jeffersonians and the Federalists over the Alien Act of 1798. *See* 8 Annals of Cong. 2012, 2019 (1798). *See also* Stephen J. DiGianfilippo, *The Reach of the Constitution Beyond the Territory and 'People' of the United States*, 16 Suffolk Transnat'l L.Rev. 117, 123–32 (1992).

7. Consistent with these sentiments, Justice Kennedy, in his concurring opinion, declared "the Constitution does not create, nor do general

In support of this premise, the Court relied on *Johnson v. Eisentrager*, 339 U.S. 763, 771, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), in which it held that aliens arrested in China and imprisoned in Germany after World War II could not obtain writs of habeas corpus on the ground that their convictions for war crimes violated the Fifth Amendment. The *Verdugo–Urquidez* court noted that *Johnson's* rejection of the "extraterritorial application of the Fifth Amendment was emphatic," quoting the following language from the latter opinion as indicating that a claim of universal extraterritoriality:

> would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. None of the learned commentators on our Constitution has even hinted at it. The practice of every modern government is opposed to it.

*Verdugo–Urquidez*, 494 U.S. at 269, 110 S.Ct. 1056 (citations omitted) (quoting *Johnson*, 339 U.S. at 784, 70 S.Ct. 936). The Court further rejected Verdugo–Urquidez's reliance on cases such as *Russian Fleet, supra,* holding they "establish only that aliens receiving constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." 494 U.S. at 271, 110 S.Ct. 1056.[8] The Mexican respondent, it concluded, was "an alien who has no previous significant voluntary connection with the United States, so these cases avail him not." *Id. See also Kukatush Mining Corp. (N.P.L.) v. SEC*, 309 F.2d 647, 649 (D.C.Cir.1962); *Hoffman v. United States*, 53 F.Supp.2d 483, 490–91 (D.D.C.1999).

Summarizing the law as it stands following the *Verdugo–Urquidez* decision, a preeminent constitutional scholar has stated:

In sum, there are differences in the extent to which individual rights may limit the foreign policy of the United States at home or abroad. In the United States, virtually all the safeguards of the Constitution apply to all who are here—citizens, alien residents, even those sojourning temporarily or in transit. Outside the United States, constitutional protection for the individuals against governmental action is enjoyed . . . by U.S. Citizens, perhaps also by alien residents of the United States who are temporarily abroad. On the other hand, after *Verdugo*, foreign nationals abroad may not succeed even with some constitutional claims that lower courts had previously recognized.

Louis Henkin, *Foreign Affairs and the U.S. Constitution* 307 (2d ed.1996). Another commentator has similar stated: "In short, citizens are protected wherever they go, subject to limits imposed by territoriality, and aliens, although protected when within the United States because of territoriality, are not protected from United States government conduct abroad." Roszell Dulany Hunter, IV, Note, *The Extraterritorial Application of the Constitution—Unalienable Rights?*, 72 Va. L.Rev. 649, 671 (1986). *See also* Jeremy Maltby, *Juggling Comity and Self–Government: The Enforcement of Foreign Libel Judgments in U.S. Courts*, 94 Colum. L.Rev. 1978, 2014 (1994) (indicating "established bases for extending constitutional protection are territoriality and contract" and a foreign audience may not complain of "conduct occur[ing] extraterritorially").

Of course, neither *Verdugo–Urquidez*, nor virtually any of the other cases discussing the "substantial connections" requirement, involve the Takings Clause—rather, these cases typically involve the Fourth Amendment and those clauses of the Fifth Amendment ordinarily applicable in crimi-

---

principles of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory." 494 U.S. at 275, 110 S.Ct. 1056 (Kennedy, J., concurring).

**8.** In other cases, the Supreme Court has declared unequivocally, with respect to nonresident aliens owning property within the United States, that

they, "as well as citizens [,] are entitled to the protection of the Fifth Amendment." *United States v. Pink*, 315 U.S. 203, 228, 62 S.Ct. 552, 86 L.Ed. 796 (1942). *See also Guessefeldt v. McGrath*, 342 U.S. 308, 317–19, 72 S.Ct. 338, 96 L.Ed. 342 (1952); *Sardino v. Federal Reserve Bank*, 361 F.2d 106, 111 (2d Cir.1966), *cert. denied*, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966).

nal proceedings, such as the right against self-incrimination. Moreover, the Supreme Court in *Verdugo–Urquidez* based its holding not only on the "substantial connections" rationale, but also on an exegesis of the phrase "the people," as contained in the Fourth Amendment.[9] Similar language is not found in the Takings Clause. Nonetheless, several reasons militate in favor of applying the "substantial connections" requirement in the takings context.

First, the "substantial connections" rationale employed in *Verdugo–Urquidez, Johnson* and other cases does not hinge on the specific language of any amendment, but rather on an overarching construct of the limited extraterritoriality of the Constitution and, in particular, the Bill of Rights. This construct, which is based on the concepts of territoriality and compact, is equally applicable to the Takings Clause as any other part of the Constitution. Indeed, in *Verdugo–Urquidez,* the Court, while recognizing that the Fourth Amendment's use of the phrase "the people" "contrasts with the words 'person' and 'accused' used in the Fifth and Sixth Amendments," nonetheless relied on precedents involving the latter amendments in reaching its conclusion. *Id.* at 265–66, 110 S.Ct. 1056.[10] Moreover, in *Johnson,* the Supreme Court recognized that any analysis of the limited extraterritoriality of the criminal protections of the Fifth Amendment was extendable to the entire Bill of Rights. In this regard, the Court in *Johnson* wrote: "If the Fifth Amendment confers its rights on all the

world ..., the same must be true of companion civil-rights Amendments, for none of them is limited by its express terms, territorially or as to persons. Such a construction would mean ... the American Judiciary [must] ... assure ... freedoms of speech, press and assembly, ... and security against 'unreasonable' searches and seizures as in the Fourth [Amendment]...." *Johnson,* 339 U.S. at 784, 70 S.Ct. 936.

Second, some courts and commentators have surmised that since the "substantial connections" requirement bars the defensive assertion of constitutional rights, as a shield, by aliens haled into U.S. courts and subjected to criminal prosecution, it certainly must bar offensive assertions of constitutional rights, as a sword, by nonresident aliens voluntarily seeking redress in civil proceedings. This point is well illustrated by *Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144, 152 (D.D.C.1976), where the court refused to allow an Austrian citizen to sue the United States for violations of the Fourth Amendment, observing that the alien's "lack of contact with the American legal system minimizes any expectation of hope that he could utilize that legal system for his protection." In refusing to grant standing, the court concluded that an offensive use of the Constitution is precluded to an alien "who is not subjected to the laws of this country and who can utilize the laws of his own country to protect himself." *Id.* at 153.[11] *See also Eminente v. Johnson,* 361 F.2d 73, 73 (D.C.Cir.

9. In this regard, the court observed that the Fourth Amendment (like the First and Second amendments) uses the term "the people," a phrase understood by the Framers to refer "to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 494 U.S. at 265, 110 S.Ct. 1056.

10. Likewise, in *Russian Volunteer Fleet,* the Supreme Court relied upon cases involving other clauses of the Fifth Amendment in concluding that the Takings Clause applied to a nonresident alien corporation with property in the United States. *Russian Volunteer Fleet,* 282 U.S. at 489, 51 S.Ct. 229.

11. In *Cardenas v. Smith,* 733 F.2d 909 (D.C.Cir. 1984), an alien sought damages from the Attorney General based on his seizure of the alien's Swiss bank account allegedly in violation of the

Fourth and Fifth Amendment. While the court stated that such an individual might have standing, it ultimately reversed the district court's grant of summary judgment in favor of the Attorney General on a different ground, stating:

Nonetheless, we are not prepared today to conclude that Cardenas has standing to invoke the protection of the Constitution against actions of the American government. Given the difficulties and far-reaching consequences of a doctrine that enhances an alien's standing to put on a constitutional mantle, we are reluctant to apply such a rationale to a case where the complaint is broadly drawn, the facts remain obscure, and where, in any event, such a conclusion may be unnecessary to the ultimate disposition of the plaintiff's claims.

*Id.* at 917. *See also DKT Memorial Fund, Ltd. v. AID,* 887 F.2d 275, 284–86 (D.C.Cir.1989).

1966) (per curiam), *cert. denied,* 385 U.S. 929, 87 S.Ct. 287, 17 L.Ed.2d 211 (1966) (nonresident alien may not sue United States for damages to property in foreign country allegedly caused by U.S. armed forces); *Transportes Aeros Mercantiles Panamericanos, S.A.,* 562 F.Supp. at 709 (suggesting that Columbian nationals lacked standing "to invoke provisions of the United States Constitution to wrest damages from United States officials for acts committed in Columbia"); Hunter, *supra* at 670 ("Thus, in the context of offensive assertion of constitutional rights, aliens have found United States courts unresponsive to their claims"). Consistent with this analysis, at least one court has expressly applied the "substantial connections" analysis in *Verdugo–Urquidez* to dismiss a takings claim brought by nonresident aliens. *Hoffman,* 53 F.Supp.2d at 490.

Finally, although not always identified as such, the "substantial connections" requirement is well-evidenced in numerous cases involving takings claims. Consistent with the compact theory of the Constitution, one form of substantial connection has been found in the citizenship or residency of the claimant. Thus, the Federal Circuit and this court's predecessor have held that the Takings Clause extends to property abroad owned by American citizens. *See Langenegger v. United States,* 756 F.2d 1565, 1570 (Fed.Cir.1985), *cert. denied,* 474 U.S. 824, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985) (American citizen has standing to allege taking of interests in large coffee plantation in El Salvador); *Seery v. United States,* 130 Ct.Cl. 481,

127 F.Supp. 601, 603 (1955) (same for U.S. citizen's property in Austria); *Wiggins v. United States,* 3 Ct.Cl. 412, 422 (1867) (same for U.S. citizen's property in Costa Rica). In other cases, the substantial connection triggering the application of the Takings Clause has derived from the concept of territoriality and been supplied by the location of the property within the sovereign jurisdiction of the United States. The seminal case of *Russian Volunteer Fleet,* for example, involved a res within the jurisdiction of the United States—contracts for ships under construction in American yards. 282 U.S. at 487, 51 S.Ct. 229. Other cases have applied the Takings Clause to property located in the then trust territories of the United States. *See Nitol v. United States,* 7 Cl.Ct. 405, 415 (1985)(inhabitants of Marshall Islands may invoke just compensation clause); *Juda v. United States,* 6 Cl.Ct. 441, 455–58 (1984)(same). *See also Porter v. United States,* 204 Ct.Cl. 355, 496 F.2d 583, 591 (1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975) (noting, in dicta, that inhabitants of Pacific Islands Trust Territory may allege taking).[12]

In the instant case, the plaintiff is a nonresident alien and the property in question is in Somalia and thereby outside the sovereign jurisdiction of the United States. As such, it is apparent that neither the plaintiff nor his property possess the requisite substantial connection with the United States that would allow for his invocation of the Takings Clause.[13] Accordingly, the court must dis-

---

**12.** Plaintiff argues that these "trust territory" cases stand for the proposition that the Takings Clause may be asserted by nonresident aliens with respect to property outside the United States. The court does not believe these cases go so far. *See Ramirez de Arellano v. Weinberger,* 724 F.2d 143, 155 n. 18 (D.C.Cir.1983) (Scalia, J.), *rehearing granted,* 745 F.2d 1500 (D.C.Cir. 1984), *cert. granted and vacated,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985) (noting that *Porter* did not address a claim by a foreign corporation "with regard to action outside the jurisdiction of the United States"). Were these decisions construed in the fashion plaintiff contends, they would be inconsistent with the Supreme Court's opinions in *Verdugo–Urquidez* and *Johnson.*

**13.** Plaintiff intimates there was an implied-in-fact contract between him and the military to

provide compensation for the use of his compound. He, however, makes no such assertion in his complaint and none of the facts alleged therein indicate the existence of an implied-in-fact contract, which ordinarily requires the same contractual elements as an express contract, including a "meeting of the minds," consideration and an unambiguous offer and acceptance. *See, e.g., Vines v. United States,* 30 Fed.Cl. 711, 714 (1994). Because this court concludes that plaintiff lacks standing, it does not reach defendant's alternative argument that no taking occurred here because the compound was occupied due to military necessity and not as the result of an exercise of the government's power of eminent domain. *See National Bd. of Young Men's Christian Ass'n v. United States,* 184 Ct.Cl. 427, 396 F.2d 467, 470–71 (1968), *aff'd,* 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969)(no taking where U.S. troops sought refuge from rioters in

miss plaintiff's complaint.[14]

### III. Conclusion

For the foregoing reasons, the court GRANTS defendant's motion to dismiss, and directs the entry of judgment accordingly.

building); *Franco–Italian Packing Co. v. United States*, 130 Ct.Cl. 736, 128 F.Supp. 408, 413–14 (1955)("the sovereign is immune from liability for confiscation of private property taken by defendant, through destruction or otherwise, to prevent it from falling into enemy hands, or to protect the health of troops, or as an incidental element of defense against hostile attack and is not compensable under the fifth amendment").

14. The court notes that this ruling does not prevent plaintiff from continuing to pursue the claim that he has filed against the United Nations, which is currently in arbitration.

