**Irving and Ana ROSNER, et al., Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**No. 01–1859–CIV–SEITZ.**

United States District Court, S.D. Florida.

Aug. 28, 2002.

Order Clarifying Opinion on Denial of Reconsideration Nov. 26, 2002.

Steve W. Berman, Hagens & Berman, Seattle, WA, Jeffrey Lee Kravetz, Samuel Johnathan Dubbin, Dubbin & Kravetz, Coral Gables, FL, Jonathan W. Cuneo, The Cuneo Law Group, Washington, DC, for Irving Rosner, Ana Irving, Andrew Tibor, Irene Tibor, Irene Mermelstein, Ethel Klein, Mark Klein, Regina Baskin, Edith Reiner, Leopold Fettman, Marla Simon, Laslo Sokoly, David Mermelstein, plaintiffs.

Robyn Juanita Hermann, United States Attorney's Office, Miami, FL, Caroline Lewis Wolverton, Andrea G. Cohen, Vincent M. Garvey, United States Department of Justice, Washington, DC, for United States of America, defendant.

### ORDER ON DEFENDANT'S MOTION TO DISMISS

SEITZ, District Judge.

THIS CAUSE is before the Court on Defendant's Motion to Dismiss under Fed. R.Civ.P. 12(b)(1) and 12(b)(6) [D.E. No. 16]. Plaintiffs bring this class action lawsuit on behalf of Hungarian Jews, and their descendants, whose personal proper-

ty and valuables they believe were stolen and loaded onto the "Hungarian Gold Train" by the pro-Nazi Hungarian government during World War II, and later seized by the United States Army outside of Salzburg, Austria. Specifically, Plaintiffs' Complaint alleges three counts: (1) unconstitutional taking in violation of the Fifth Amendment to the United States Constitution; (2) breach of an implied-in-fact contract of bailment; and (3) violation of conventional and customary international law.

The Government moves to dismiss on the following grounds: (1) Plaintiffs' Complaint is untimely, and therefore, barred in its entirety by sovereign immunity; (2) Plaintiffs' claim of international law violations (Count III) is barred because Congress has not waived sovereign immunity for such a claim; (3) Plaintiffs' Fifth Amendment claim (Count I) fails to state a claim upon which relief can be granted; and (4) Plaintiffs' claim for breach of an implied-in-fact contract of bailment (Count II) fails to state a claim upon which relief can be granted.[1]

After hearing oral argument on August 22, 2002, and for the reasons stated below, the Government's motion is granted in-part and denied in-part. Specifically, the Court rules as follows: (1) based on the allegations in the Complaint, Plaintiffs' viable claims are not time-barred under the principles of equitable tolling; (2) to the extent that Plaintiffs seek non-monetary relief pursuant to the Administrative Procedure Act, the international law claim (Count III) is viable; (3) Plaintiffs' Fifth Amendment claim (Count I) fails to state a claim upon which relief can be granted, and thus, will be dismissed with prejudice; and (4) Plaintiffs' claim for breach of an implied-in-fact contract of bailment (Count

II) does state a claim upon which relief can be granted.

## BACKGROUND

On March 19, 1944, towards the end of World War II, Germany invaded Hungary. Soon thereafter, through a series of discriminatory decrees, the pro-Nazi Hungarian government forced all Jews to turn over their gold, silver, gems, and other personal valuables to the authorities. Ultimately, the Hungarian government decreed that all Jewish-owned wealth and property belonged to the Hungarian government.

In the fall and winter of 1944–45, as the prospect of Germany's defeat loomed larger, the Hungarian government, at the direction of the Nazis, loaded the stolen Jewish property onto a train bound for Germany. Because of the value of the train's cargo, the train became known as the "Gold Train." The lengthy train, consisting of over forty cars, made its way from Hungary into Austria, but never made it to German territory.

On or about May 11, 1945, the U.S. Army seized the Gold Train from pro-Nazi Hungarian troops outside of Salzburg, Austria. Due to the war-ravaged conditions of Europe's rail system, the Gold Train remained south of Salzburg, under guard of American troops, for close to three months. In late July 1945, after the railway system was marginally repaired, the train was moved, via U.S. Army locomotive, to the Maglan suburb of Salzburg. From there, the assets on the Gold Train were moved by truck to storage facilities in Salzburg. According to Plaintiffs, the majority of the assets, with the exception of the 1200 paintings, were stored in the

---

**1.** The Government's first two dismissal arguments maintain that the Court lacks subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). The latter two, however, argue that Plaintiffs have failed to state a claim under Fed.R.Civ.P. 12(b)(6).

Military Government Warehouse. The artwork was stored elsewhere in Salzburg.

Plaintiffs maintain that the property on the Gold Train was identifiable. The items on the train were in locked containers with the names and addresses of the owners on the outside. The Jewish families placed their items in such containers, along with other identifying marks, to enable them to reclaim their belongings.[2]

Additionally, Plaintiffs claim that the Government was in possession of overwhelming circumstantial evidence that the property on the Gold Train belonged to Hungarian Jews and that such property was identifiable. Yet, notwithstanding such evidence, and despite repeated requests from the Hungarian Jewish community, Plaintiffs allege that in the summer of 1946, the United States Government declared that it was not possible to identify either the individual owners of the property or even the appropriate country of ownership. Thereafter, unbeknownst to Plaintiffs or the public, the Government sold, distributed and/or requisitioned the property from the Gold Train. According to Plaintiffs, a majority of the property was sold through the Army Exchange Service or donated to international refugee services, some of the property was used by U.S. military officers as home and office furnishings, and a substantial amount of property was looted from the warehouse in Salzburg.

Plaintiffs do not know the ultimate disposition of the property. Because of the amount of time that has elapsed, combined with the classification of many official documents pertaining to their property, most, if not all of the putative class could not have known about the facts giving rise to

this lawsuit. These Plaintiffs maintain it was only in October 1999, when the Presidential Advisory Commission on Holocaust Assets released its Report on the Gold Train, that many of the facts presented in their Complaint came to light.

### *LEGAL STANDARD*

As stated above, the Government moves to dismiss the Complaint under both Rule 12(b)(1) and Rule 12(b)(6). On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217(1980); *Baydar v. Renaissance Cruises, Inc.*, 35 F.Supp.2d 916, 917 (S.D.Fla. 1999). In evaluating whether subject-matter jurisdiction exists, a court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (overturned on other grounds by *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

Attacks on subject matter jurisdiction arise in two forms: facial attacks and factual attacks. Facial attacks "require [ ] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (citations omitted). "Factual attacks," on the other hand, challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.*

---

**2.** As to the named Plaintiffs, it is not clear, based upon the Complaint, that their belongings were specifically identifiable Gold Train property. Plaintiffs will need to be prepared to address this issue during discovery, and if a named Plaintiff cannot demonstrate identifiable property, he or she will not be able to pursue a claim for an implied-in-fact contract for bailment.

Here, the Government's first two dismissal arguments assert only facial attacks.

To survive a Rule 12(b)(6) motion to dismiss, a complaint need only provide a short and plain statement of the claim and the grounds on which it rests. *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A Rule 12(b)(6) motion tests not whether the plaintiff will prevail on the merits, but instead, whether the plaintiff has properly stated a claim. *See* Fed.R.Civ.P. 12(b)(6); *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683. Thus, a court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). In deciding such a motion, the court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the nonmovant's favor. *See Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683. Regardless of what standard a court uses, the threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low. *Ancata v. Prison Health Svcs., Inc.*, 769 F.2d 700, 703 (11th Cir.1985) (citation omitted).

## LEGAL ANALYSIS

### A. Sovereign Immunity

#### 1. Statute of Limitations

As a sovereign, the United States cannot be sued in its own courts unless Congress explicitly authorizes such suit. *See United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). "A neces-sary corollary of this rule is that when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied." *Block v. North Dakota ex rel. Bd. of Univ. and Sch. Lands*, 461 U.S. 273, 287, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983). One of those conditions is the statute of limitations, which reflects Congress's decision to waive sovereign immunity only if suit is brought within a particular period of time. *See Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957). As such, compliance with the applicable statute of limitations is a condition of federal court jurisdiction. *Id.*

The applicable statute of limitations for Plaintiffs' claims is six years. 28 U.S.C. § 2401(a) ("every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues"). Accordingly, the Government argues that because Hungarian Jews knew by at least 1947 that the United States Army had possession of the Gold Train, the limitations period expired no later than 1953. In response, Plaintiffs make two arguments: (1) under the continuing violation doctrine the limitations period has not yet run; and (2) the limitations period should be tolled based on principles of equitable tolling.[3] The continuing violation doctrine is not applicable in this case. Equitable tolling, however, is warranted and thus the Complaint as pled is timely.

---

**3.** The Federal Circuit recently questioned whether "equitable principles may ever warrant recognizing an exception to the six-year statute of limitations" for suits against the United States. *Frazer v. United States*, 288 F.3d 1347 (Fed.Cir.2002). Nonetheless, because Supreme Court precedent provides that there is a rebuttable presumption that equitable tolling is available in suits against the United States, *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), the Court cannot, at this stage, reject outright Plaintiffs' equitable tolling argument.

### (a) *Continuing Violation Doctrine*

 The continuing violation doctrine provides that a claim, which otherwise would be precluded because it is based on conduct which falls outside the limitation period, may nonetheless be considered timely if there is a "substantial nexus" between that conduct and conduct occurring within the limitations period. *See Roberts v. Gadsden Memorial Hospital,* 835 F.2d 793, 800 (11th Cir.1988); *Dunn v. Air Line Pilots Ass'n,* 836 F.Supp. 1574, 1583 (S.D.Fla.1993) ("under [the continuing violation doctrine], the plaintiff may recover for all violations where the violations outside the limitation period are so closely related to those inside the period that they constitute one continuing infraction"). In other words, there must be a specific act of misconduct within the filing period and a substantial link between this act and the alleged misconduct outside of the filing period which forms the basis of Plaintiffs' claims. However, "[a] claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief" may not be filed outside of the limitations period. *Hipp v. Liberty National Life Insurance Co.,* 252 F.3d 1208, 1222 (11th Cir.2001) (quoting *Gadsden Memorial,* 850 F.2d at 1550). In practice, where a plaintiff establishes that there is a continuing violation, the statute of limitations will accrue from the date of the last wrongful act. *See Coon v. Georgia Pacific Corp.,* 829 F.2d 1563, 1570 (11th Cir.1987) (addressing continuing violation doctrine in Title VII context); *see also Hipp,* 252 F.3d at 1222 ("the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated") (citations omitted).

The Government maintains that because there has been neither a taking nor other unlawful act forming the basis of Plaintiffs' claims within the six year period preceding the filing of the Complaint, the continuing violation doctrine is not applicable. Plaintiffs, however, relying primarily on the decision in *Bodner v. Banque Paribas,* 114 F.Supp.2d 117 (E.D.N.Y.2000),[4] maintain that the Government's continued failure to return the property and its false representations that the property was not identifiable, constitute a continuous and ongoing violation of law. Thus, under Plaintiffs' theory, because the wrongful acts at issue are still ongoing, the statute of limitations has not yet begun to accrue.

The continuing violation doctrine is not applicable in this case. Like all exceptions to the laws of accrual, the doctrine has limited applicability and is to be narrowly construed. *See Moseke v. Miller and Smith, Inc.,* 202 F.Supp.2d 492, 504 (E.D.Va.2002). Indeed, it is usually invoked in the context of Title VII or employment discrimination actions where the applicable limitations period is a mere 300 days. *See, e.g., McGregor v. Louisiana State Univ. Bd. of Supervisors,* 3 F.3d 850, 866 n. 27 (5th Cir.1993) (citing cases), *cert. denied,* 510 U.S. 1131, 114 S.Ct. 1103, 127 L.Ed.2d 415 (1994) ("courts, including this one, are wary to use the continuing violation doctrine to save claims outside the area of Title VII discrimination cases"). As such, it acts as a limited counterbalance to a relatively short limitations period. Moreover, in the employment discrimina-

---

**4.** In *Bodner,* descendants of Jewish customers of French financial institutions sued those institutions, claiming damages arising from participation in a scheme to appropriate assets of customers during Nazi occupation and subsequent failure to disgorge assets to them as rightful owners. Upon a finding that "the nature of plaintiffs claim is such that the continued denial of their assets, as well as facts and information relating thereto, if proven, constitutes a continuing violation," the Court tolled the applicable statute of limitations. 114 F.Supp.2d at 134–35.

tion context, the continuing violation doctrine may be necessary to protect an employee who fails to file a timely charge because he fears reprisal from his employer. *See Gray v. Phillips Petroleum Co.,* 858 F.2d 610, 614 (10th Cir.1988). Also, because discrimination often consists of a series of minor acts, and it may not be apparent to the victim that they add up to a violation until some time after the first act, the continuing violation doctrine is particularly well suited for Title VII cases. *See Kostenbader v. Kelly–Springfield Tire Corp.,* 2001 WL 910383, *2 (N.D.Ill.2001) (citation omitted). None of these concerns are present in this case. Indeed, with the exception of *Bodner,* this Court is unable to find any case, with facts similar to this case, where a court applied the continuing violation doctrine.

Even if the continuing violation doctrine were potentially applicable in this case, Plaintiffs do not allege that a "taking" or other unlawful act forming the basis for their claims occurred within the six year period preceding the filing of their Complaint. Therefore, because Plaintiffs' have not alleged a continuing violation of law, and because this Court is unwilling to drastically extend the continuing violation doctrine, Plaintiffs' Complaint is barred by the applicable statute of limitations unless it falls within another exception.

### (b) *Equitable Tolling*

■ The equitable tolling doctrine allows plaintiffs to sue after the expiration of the applicable statute of limitations, provided they have been prevented from doing so due to inequitable circumstances. *See Ellis v. General Motors Acceptance Corp.,* 160 F.3d 703, 706 (11th Cir.1998)

(citation omitted); *see also Justice v. United States,* 6 F.3d 1474, 1475, 1479 (11th Cir.1993) (stating that equitable tolling is applied when necessary to prevent an injustice). The Government maintains that because Plaintiffs have not alleged that they were tricked into allowing the filing deadline to pass, and because they did not pursue judicial remedies within the original six-year limitations period, equitable tolling is not permissible. In response, Plaintiffs, again rely on *Bodner* and argue that they have alleged that the Government has kept them ignorant of vital information necessary to pursue their claims, without any fault or lack of due diligence of their part. Alternatively, Plaintiffs maintain that the brutal reality of the Holocaust, and the resulting extraordinary circumstances that Plaintiffs were forced to endure, merits application of equitable tolling in this case.

Recently, the United States Supreme Court stated, "limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute." *Young v. United States,* 535 U.S. 43, 122 S.Ct. 1036, 1040, 152 L.Ed.2d 79 (2002) (internal quotations omitted).[5] In particular, the Court stated that equitable tolling is permitted in situations "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, *or* where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Id.* at 1041 (citing *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)) (emphasis added). The Court also suggested, however, that "tolling might be

---

**5.** In *Young,* the Supreme Court concluded that the Bankruptcy Code's "three-year lookback period," 11 U.S.C. §§ 523(a)(1)(A), 507(a)(8)(A)(i), is a statute of limitations subject to traditional principles of equitable tolling. 122 S.Ct. at 1039. Specifically, the Court held that the "lookback period" is tolled during the pendency of a prior bankruptcy petition. *Id.* at 1043.

appropriate in other cases" as well. *Id.* (citing *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (*per curiam* )).[6] Thus, in addition to satisfying one of the Supreme Court's tests mentioned above, equitable tolling may also be warranted based upon certain extraordinary circumstances. *See, e.g., Bodner,* 114 F.Supp.2d at 135.

The allegations of the Complaint satisfy the second Supreme Court test, namely, that Plaintiffs were induced or tricked by the Government's misconduct into allowing the filing deadline to pass. Because this issue is arising on a motion to dismiss, the Court must accept as true that "[p]laintiffs and other members of the class have been kept in ignorance of vital information essential to pursue their claims, without any fault or lack of diligence on their part."[7] (Complaint, ¶ 90). In particular, Plaintiffs allege that in addition to seizing and subsequently not returning the Gold Train property, the United States Government has also continued to wrongfully claim that the property on the Gold Train was unidentifiable and thus unreturnable. (Complaint, ¶ 86, 87, 90). Moreover, Plaintiffs allege that the Government essentially turned a deaf ear to Plaintiffs' repeated requests for information about their property. (*Id.*). "It was only in October 1999,

when the Presidential Advisory Commission on Holocaust Assets released its report on the Gold Train" that the facts necessary to file their Complaint came to light.[8] (Complaint, ¶ 90).

Taken as true, these allegations present the Court with a set of circumstances that warrant equitable tolling of the limitations period. In addition, the Court notes that, for the majority of Plaintiffs, the years following World War II were particularly difficult. This, combined with the fact that the Government cannot benefit from its own alleged misconduct, tips the balance in favor of tolling the limitations period. Accordingly, at this stage of the proceedings, given the equitable considerations at play in this case, Plaintiffs are entitled to the benefit of equitable tolling and their Complaint is timely.

### 2. *Sovereign Immunity With Respect to International Law Claim*

In addition to arguing that Plaintiffs' claims are time-barred, the Government also maintains that Plaintiffs' claim for international law violations (Count III) is barred because Congress has not waived sovereign immunity for claims based on conventional and customary international law.[9] In response, Plaintiffs cite to the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, the Little Tucker Act, 28 U.S.C.

---

**6.** Although the Court in *Brown* did not apply equitable tolling to rescue respondent's Title VII action, the Court did recount a number of situations which would justify equitable tolling of a limitations period, i.e., inadequate notice, motion for appointment of counsel is pending, court led plaintiff to believe that she had done everything required of her, or affirmative misconduct on the part of a defendant lulled plaintiff into inaction. 466 U.S. at 151, 104 S.Ct. 1723.

**7.** In fact, Courts within this Circuit "have also held on numerous occasions that, as a general rule, the issue of when a plaintiff in the exercise of due diligence should have known of

the basis for his claims is not [even] an appropriate question for summary judgment." *Morton's Market, Inc. v. Gustafson's Dairy, Inc.,* 198 F.3d 823, 832 (11th Cir.1999) (citations omitted).

**8.** Accordingly, the limitations period began to run in 1999 and would have expired in 2005.

**9.** The Government indicates that apart from its statute of limitations argument, it is not asserting sovereign immunity with respect to Plaintiffs' claims under the Fifth Amendment (Count I) and for breach of implied-in-fact contract of bailment (Count II). (Def.'s Reply at 5).

§ 1346(a)(2), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, as providing the necessary waiver of sovereign immunity. The ATCA and the Little Tucker Act do not provide the necessary waiver of sovereign immunity. The APA, however, does waive sovereign immunity solely to the extent that Plaintiffs seek non-monetary relief.

### (a) *Alien Tort Claims Act*

■ The ATCA supplies federal courts with jurisdiction over tort claims brought by aliens for violation of international law. 28 U.S.C. § 1350 ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."). The ATCA, however, is a jurisdictional statute only and does not itself waive sovereign immunity.[10] *Goldstar v. United States*, 967 F.2d 965, 968 (4th Cir.1992) ("the Alien Tort Statute has been interpreted as a jurisdictional statute only—it has not been held to imply any waiver of sovereign immunity") (citations omitted). Accordingly, the ATCA does not provide the necessary waiver of sovereign immunity.

### (b) *Little Tucker Act*

■ As stated above, the United States is immune from suit unless it consents to be sued. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Through passage of the Little Tucker Act, 28 U.S.C. § 1346(a)(2), Con-

gress has waived sovereign immunity for non-tort claims against the United States "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1346(a)(2). While the Tucker Act, 28 U.S.C. § 1491, grants jurisdiction over such claims to the United States Court of Federal Claims, the Little Tucker Act establishes concurrent jurisdiction between the Court of Federal Claims and the district courts for Tucker Act claims of less than $10,000.[11]

The crux of the Government's argument is that because claims based on international law are not explicitly listed under the Little Tucker Act, the United States has not waived its sovereign immunity. To bolster its argument, the Government relies on *Phaidin v. United States*, 28 Fed. Cl. 231 (1993), which stated that the "Tucker Act contains no language permitting this court to entertain jurisdiction over claims founded upon customary international law." 28 Fed. Cl. at 234. Plaintiffs, however, maintain that such holding is contrary to the Supreme Court's holding in *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), and thus is an incorrect statement of the law. The Court disagrees.

Plaintiffs' reliance on *Mitchell* is misplaced.[12] The Supreme Court in *Mitchell*

---

**10.** Indeed, Plaintiffs do not dispute this point. (Opposition Memorandum at 37).

**11.** Because none of the Plaintiffs assert claims in excess of $10,000, (Complaint, ¶ 18), the Government does not contend that this case should be in the Court of Federal Claims.

**12.** The confusion results from *Phaidin*'s reliance on *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). In *Testan*, the Supreme Court suggested that the Tucker Act does not waive the sovereign im-

munity of the United States. 424 U.S. at 400, 96 S.Ct. 948. Seven years later, however, in *Mitchell*, the Supreme Court, without questioning its holding in *Testan*, determined that its language suggesting that the Tucker Act does not effect a waiver of sovereign immunity should be disregarded. *Mitchell*, 463 U.S. at 216, 103 S.Ct. 2961.

Accordingly, because *Phaidin* cites *Testan*'s repudiated language, Plaintiffs argue that *Phaidin*'s holding, namely that international law claims are not permitted under the Tuck-

clearly held that "[i]f a claim *falls within the terms of the Tucker Act,* the United States has presumptively consented to suit." *Id.* at 216, 103 S.Ct. 2961. (emphasis added). Consequently, because a claim based on international law does not fall within the terms of the Tucker Act, *Phaidin* is good law insofar as it holds that the Tucker Act does not waive sovereign immunity for claims based on international law violations. 28 Fed. Cl. at 234. Accordingly, the Court finds that the Little Tucker Act does not provide the necessary waiver of sovereign immunity for Plaintiffs' international law claims.

### (c) *Administrative Procedure Act*

■ Plaintiffs also maintain that the APA waives sovereign immunity for their international law claims. Specifically, Plaintiffs note that their claims for non-monetary relief (i.e. return and accounting of all property), are expressly provided for under the APA. The Government, however, argues that the United States' wartime actions at issue in this case are specifically excluded from the APA's review provisions.

The APA waives the sovereign immunity of the United States for non-monetary

suits against federal agencies under specified conditions. 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."). However, the APA excludes from its review provisions actions based on "military authority exercised in the field in time of war or in occupied territory." 5 U.S.C. § 701(b)(1)(G). Accordingly, because the United States Army seized the Gold Train based on military authority exercised in the field, the Government argues that the APA's review provisions are not applicable.

To combat the Government's argument, Plaintiffs make essentially three arguments: (1) the Government's argument is a factual attack on the pleadings, not a facial one, and thus improper under the Government's description of its motion; (2) the actions giving rise to Plaintiffs' claims were not based on military authority exercised in the field, but rather, were ordered from American soil; and (3) Plaintiffs' allegations refer to events that occurred after the war ended.

Plaintiffs' first two arguments lack merit.[13] With respect to Plaintiffs' third point,

---

er Act, must be bad law as well. Plaintiffs state too much. *Phaidin* did not rely on *Testan* in reaching its discrete holding that the Tucker Act does not waive sovereign immunity for international law claims. Moreover, even if *Phaidin* should be disregarded, such does not further Plaintiffs' assertion that the Tucker Act waives sovereign immunity for international law claims. *Phaidin* in no way impacts *Mitchell*'s instruction that the Tucker Act waives sovereign immunity solely for the classes of claims it lists. *Mitchell,* 463 U.S. at 216, 103 S.Ct. 2961.

**13.** With respect to Plaintiffs' first point, the Court notes that "[i]n reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto in the light most favorable to the plaintiff." *Gould*

*Electronics Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000). However, the Government's invocation of the "war function" exception does not require this Court to consider matters outside of the pleadings. The Complaint itself contains sufficient facts from which to address this issue.

Plaintiffs' second point essentially asks this Court to exalt form over substance. As the Government correctly notes, virtually all military action will be traceable, at some level, back to United States soil. Thus, to allow the exception that Plaintiffs advocate would essentially swallow the "war function" rule. Moreover, the plain language of the "war function" rule covers "military authority *exercised* in the field," without regard to where the underlying order to take military action arises. 5 U.S.C. § 701(b)(1)(G) (emphasis added).

that the allegations of the Complaint refer to events that occurred after World War II, the Court finds this argument to have merit. While this Court defers to the political branches with respect to military matters, such deference does not extend to all actions which could arguably be traced back to an exercise of military authority. *See Owens v. Brown*, 455 F.Supp. 291, 300 (D.D.C.1978) ("Whether the deference due particular military determinations rises to the level of occasioning non-reviewability is a question that varies from case to case and turns on the degree to which the specific determinations are laden with discretion and the likelihood that judicial resolution will involve the courts in an inappropriate degree of supervision over primary military activities."). Plaintiffs' Complaint makes specific allegations regarding conduct that, although exercised by military personnel, is decidedly non-military in its nature.[14] (*See* Complaint, ¶¶ 68—88). Accordingly, just as Plaintiffs' argument that the war function exception does not apply to orders coming from U.S. soil states too much, so too does the Government's attempt to bring all its actions with respect to the Gold Train within the shield of the "war function" exception. Therefore, to the extent that Plaintiffs seek the non-monetary relief of an accounting and return of their property pursuant to the APA, the Court finds a waiv-

er of sovereign immunity with respect to Count III.

## B. *Fifth Amendment Claim*

■ Count I of Plaintiffs' Complaint alleges a violation of the Fifth Amendment to the United States Constitution, which provides, in pertinent part, "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. Specifically, Plaintiffs allege that the United States government took possession of Plaintiffs' property from the Gold Train, and used it for public purposes without providing any compensation to Plaintiffs.

The Government maintains that Plaintiffs' Fifth Amendment claim fails to state a claim upon which relief can be granted because the Fifth Amendment may not be asserted by non-citizens[15] who lack a substantial connection to the United States. To support its contention, the Government relies on a line of cases which refuse to apply the Fourth or Fifth Amendment extraterritorially. *Ashkir v. United States*, 46 Fed. Cl. 438 (2000) (Fifth Amendment);[16] *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (Fifth Amendment);[17] *United States v. Verdugo–Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (Fourth Amendment).[18] Plaintiffs, on the other hand, base their argument in favor of ex-

---

**14.** Plaintiffs specifically aver that the actual taking of the Gold Train property occurred after hostilities had ceased and peace was formally declared. (Complaint, ¶ 105).

**15.** All named Plaintiffs, except Edith Reiner, are currently United States citizens. At the time of the alleged taking, however, none were citizens of this country.

**16.** In *Ashkir*, Plaintiff, a citizen and resident of Somalia, sought compensation under the Fifth Amendment for the physical occupation and destruction of his property in Mogadishu, Somalia by the United States armed forces. 46 Fed. Cl. at 438–39. The Court dismissed the claim.

**17.** In *Eisentrager*, the Supreme Court held that German nationals, confined in the custody of the United States Army in Germany following conviction by military commission, had no right to writ of habeas corpus. 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950).

**18.** In *Verdugo–Urquidez*, Chief Justice Rehnquist held that the Fourth Amendment did not apply to a search by American authorities of the Mexican residence of a Mexican citizen and resident who did not develop substantial connections with the United States. 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222.

traterritorial application of the Fifth Amendment primarily on *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931),[19] which found that an alien friend may assert a Fifth Amendment claim with respect to property located within the jurisdiction of the United States, and *Turney v. United States*, 126 Ct.Cl. 202, 115 F.Supp. 457 (1953),[20] which found the just compensation clause of the Fifth Amendment applicable in foreign countries for United States citizens.

After carefully considering both positions, the Court finds the better reasoned cases are those which refuse to apply the Fifth Amendment extraterritorially. The analysis in *Ashkir* is particularly instructive on this point in that it provides a thoughtful analysis of both sides of the issue and addresses virtually all of the relevant cases on point. Moreover, while the facts of this case and *Ashkir* are not identical, they are sufficiently analogous such that the analysis does carry over.

First, with respect to Plaintiffs' reliance on *Russian Volunteer Fleet*, the Court notes that the property at issue in that case was located within the United States. Here, however, at the time of the alleged taking, the property at issue was located in Austria. (Complaint, ¶ 104). That a portion of the Gold Train property may, at some later date, have ended up in the United States is of no consequence. For purposes of this constitutional inquiry, the relevant time frame appears to be when the alleged constitutional violation occurred. *See Verdugo–Urquidez*, 494 U.S. at 274–75, 110 S.Ct. 1056 (reaching its conclusion with respect to the claimed violation based on examination of the substantial connections to the United States *"at the time of the search"*) (emphasis added). Moreover, the holding in *Russian Volunteer Fleet* was expressly limited to establishing only that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Verdugo–Urquidez*, 494 U.S. at 271, 110 S.Ct. 1056.

In analyzing the Supreme Court's decision in *Verdugo–Urquidez*, the *Ashkir* Court concluded, and this Court agrees, that notwithstanding the fact that the Fifth Amendment was not at issue,[21] "sev-

---

**19.** In *Russian Volunteer Fleet*, the petitioner, a Russian corporation, was the assignee of certain contracts for the construction of two vessels by a New York shipbuilding corporation. When the United States requisitioned these contracts, the Court held that the United States had exerted the power of eminent domain in taking the petitioner's property and thereby became bound to pay just compensation. 282 U.S. at 487, 51 S.Ct. 229.

**20.** In *Turney*, following the post-WWII creation of the Republic of the Philippines, the United States Pacific Air Service Command conveyed to the Philippines certain surplus supplies found at the Leyte Air Depot. After the surplus was sold, it was discovered later that certain radar equipment was among the items at the depot. After the new owner, a corporation, entered into negotiations to sell the equipment to the Chinese Air Force, the United States objected to the sale on security

grounds, and notified the corporation that it would repossess the radar by negotiation or seizure, with the aid of the Philippine Government. The Philippine Government, aware that the United States desired to repossess, placed an embargo upon the exportation of the radar. Ultimately, the United States received the equipment in exchange for a receipt and reservation of the right to sue for value. The Court of Claims found that the exchange amounted to a taking covered by the Fifth Amendment. 126 Ct.Cl. 202, 115 F.Supp. 457.

**21.** Although the Fifth Amendment was not at issue, in reaching its conclusion with respect to the Fourth Amendment, the Court did recount its "emphatic" rejection of extraterritorial application of the Fifth Amendment. *Verdugo–Urquidez*, 494 U.S. at 264, 269, 110 S.Ct. 1056 (citing to *Johnson v. Eisentrager*,

eral reasons militate in favor of applying the substantial connections requirement in the takings context." *Ashkir*, 46 Fed. Cl. at 443 (internal quotes omitted). Most notable among these reasons is that "since the substantial connections requirement bars the defensive assertion of constitutional rights, as a shield, by aliens haled in to U.S. courts and subjected to criminal prosecution, it certainly must bar offensive assertions...by nonresident aliens voluntarily seeking redress in civil proceedings." *Id.* at 443. To hold otherwise would be to invite constitutional claims against the United States government from all over the world, and hence, start a path down a very slippery slope.

Accordingly, applying the substantial connections requirement to the facts in this case, the Court must conclude that Plaintiffs have failed to state a claim under the takings clause of the Fifth Amendment. Regardless of what standard is employed to determine whether a substantial connection exists,[22] Plaintiffs have simply failed to allege adequate connections, at the time of the alleged taking, to rescue their claim. As stated above, at the time of the alleged taking, none of the Plaintiffs were United States citizens, and none had espoused any voluntary association with the United States of the type contemplated by the Supreme Court in *Verdugo–Urquidez*, 494 U.S. at 271–73, 110 S.Ct. 1056. These essential facts cannot be changed to save this claim. Therefore, Count I of the Complaint must be dismissed with prejudice.

339 U.S. 763, 784, 70 S.Ct. 936, 94 L.Ed. 1255 (1950)).

**22.** The Court is cognizant of Justice Brennan's dissent in *Verdugo–Urquidez*, wherein he

## C. *Breach of an Implied–In–Fact Contract of Bailment*

 Count II of the Complaint alleges that the United States is liable for breach of an implied-in-fact contract of bailment. To state such a claim, a claimant must show "mutuality of intent to contract, offer and acceptance, and that the officer whose conduct is relied upon had actual authority to bind the government in contract." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). The Government argues that the Complaint does not allege that the United States communicated to Plaintiffs an intention to return the Gold Train property. Thus, the Government maintains that Plaintiffs have failed to establish the necessary elements of an implied-in-fact contract. In response, Plaintiffs maintain that all of the elements of an implied-in-fact contract can be inferred from the parties' conduct.

Both parties agree that the elements of an implied-in-fact contract are inferred from the parties' conduct and need not be expressly stated. *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597–98, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923). As such, Plaintiffs have alleged that the Government: (1) accepted possession of Plaintiffs' property with the express knowledge that the property belonged to Plaintiffs; (2) never claimed to be the owner of the property; (3) took possession of the property with the express intent of undertaking to return the property to its rightful owners; (4) stored and guarded the property in warehouses for protection so that it could be returned

criticized the majority for failing to articulate a consistent standard from which to determine whether an individual has established the requisite substantial connections. 494 U.S. at 282–84, 110 S.Ct. 1056.

to its rightful owners; (5) indicated, expressly and through applicable laws, that any identifiable property from the Gold Train would be returned in accordance with U.S. policy and custom; and (6) falsely declared that the property was unidentifiable, thus breaching the agreement. Based on these allegations, and without deciding whether Plaintiffs can eventually prove their claim, the Court finds Plaintiffs have alleged sufficient facts to survive a motion to dismiss. Moreover, given the fact intensive nature of such a claim, such is more appropriately addressed on summary judgment.[23] Accordingly, at this stage of the proceedings, drawing all reasonable inferences in the nonmovant's favor, the Court must deny the Government's motion to dismiss Count II for failure to state a claim.

### CONCLUSION

Based on the allegations of the Complaint, equitable tolling of the applicable statute of limitations permits Plaintiffs' claims to survive the motion to dismiss. Moreover, solely to the extent that they seek non-monetary relief, Plaintiffs may proceed, pursuant to the APA, with their claim for international law violations (Count III). With respect to Plaintiffs' claim for an unconstitutional taking, however, because the Fifth Amendment may not be asserted by non-citizens who lack a substantial connection to the United States, the Court will dismiss Count I with prejudice. With respect to Count II, the Court finds that Plaintiffs' state a claim for

23. The Court expects that during discovery, Plaintiffs will identify those specific items on the Gold Train that form the basis of a contract for bailment between these Plaintiffs and the Government. Plaintiffs may also do so by filing an Amended Complaint within twenty (20) days of this Order. Failure to identify such specific items will subject a Plaintiff to

breach of an implied-in-fact contract of bailment. Accordingly, it is

ORDERED that Defendant's Motion to Dismiss is GRANTED in-part and DENIED in-part. Count I of the Complaint is DISMISSED with prejudice. With respect to Count III, Plaintiffs may seek non-monetary relief only. Count II, which alleges a breach of an implied-in-fact contract for bailment, remains.

IT IS FURTHER ORDERED that the parties shall submit a Joint Scheduling Report, in conformance with the Court's May 18, 2001 Order, no later than **September 16, 2002.**

### *ORDER DENYING UNITED STATES' MOTION FOR PARTIAL RECONSIDERATION AND CLARIFYING THE COURT'S AUGUST 28, 2002 ORDER*

SEITZ, District Judge.

THIS CAUSE is before the Court upon the United States' Motion for Partial Reconsideration. [D.E. 35] Having considered the motion, Plaintiffs' response, and the Government's reply, the Court DENIES the United States' Motion for Partial Reconsideration but GRANTS the United States' Motion to require that initial discovery focus on the Administrative Procedure Act's ("APA") military-authority exception[1] and contract formation issues. Such a structure will promote the efficient consideration of this complex case.

### *Background*

The Plaintiffs filed suit against the United States and claimed that the army's actions in connection with their "Gold Train"[2] property created an implied-in-

dismissal of their implied-in-fact contract of bailment claim.

1. *See* 5 U.S.C. § 701(b)(G) (West 2002).

2. The "Gold Train" was a train carrying the purloined property of Hungarian Jews whose property had been confiscated by the Pro-Nazi Hungarian government during World

fact contract for bailment which the United States breached and that the Government's conduct was not shielded by the APA's military-authority exception.

In its August 28, 2002 Order, the Court found that the Plaintiffs's complaint alleged enough facts to survive a motion to dismiss on the implied-in-fact contract for bailment claim. Moreover, the Court ruled that the Plaintiffs asserted sufficient facts to call into question whether the APA's military-authority sovereign immunity exception precluded judicial review of the army's actions.

### Discussion

Courts deny reconsideration motions absent (1) an intervening change in controlling law (2) newly discovered evidence; or (3) the need to correct clear error or manifest injustice. *Z.K. Marine, Inc., v. M/V Archigetis*, 808 F.Supp. 1561, 1563 (S.D.Fla.1992) (it should *not* "be used as a vehicle to present authorities available at the time of the first decision or to *reiterate arguments previously made* . . . ") (emphasis added). Because these factors arise rarely, "[granting] the motion to reconsider should be equally rare." *Id.*

### I. *The Implied–in–Fact Contract for Bailment*

The Government contends that the Court clearly erred when it refused to dismiss the Plaintiffs' implied-in-fact contract for bailment claim. According to the Defendant, the Plaintiffs have failed to allege that they satisfy "each element of a contract: mutuality of intent to contract, offer and acceptance, consideration, and that the government officer whose conduct is relied upon had actual authority to bind the United States in contract." *United States Motion for Partial Reconsideration*

*and for Stay of the Court's Order to Submit a Joint Scheduling Report,* filed September 12, 2002, at 4 (hereinafter "United States Motion") [D.E. 35] *citing Ysasi v. Rivkind,* 856 F.2d 1520, 1525 (Fed.Cir. 1988); *Alde v. United States,* 28 Fed.Cl. 26, 30 (1993).

The Government also claims that no implied-in-fact contract for bailment arose because there was no consideration. *See Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1311 (11th Cir.1998) ("It is a fundamental principle of contract law that a promise is not enforceable unless it is supported by consideration.") (citation omitted). For there to be consideration, "each party must promise to do something which will yield a benefit or advantage to the other, or which will result in a detriment or disadvantage to himself in exchange for the other promise." *Id.* According to the United States, the Plaintiffs did not allege an exchange of promises for the return of the Gold Train's contents to its rightful owners; the United States stored the goods gratuitously.

Finally, the Defendant contends that a general intent to return property cannot constitute a valid offer and acceptance and that the Plaintiffs have not alleged that a government officer with the actual authority to bind the government in contract made the promise to the Plaintiffs to return the property. *United States Motion* at 4.

The August 28th Order noted that "an implied-in-fact contract can be inferred from the parties' conduct and need not be expressly stated." *August 28, 2002 Order* at 17, *citing Baltimore & Ohio R.R. v. United States,* 261 U.S. 592, 597–98, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816

War II. The Gold Train was headed for Germany but was intercepted by the United States Army near Salzburg, Austria.

(1923). The Plaintiffs alleged sufficient facts to infer that an implied-in-fact contract for bailment arose from the conduct of some of the Plaintiffs and the Government.[3] Because of the fact-intensive inquiry of determining whether a contract was formed, the Court ruled that this issue should be resolved after discovery.

Plaintiffs also sufficiently alleged facts that implied that there was consideration. The Plaintiffs assert that they suffered the detriment of loaning their valuable property to the United States in exchange for the promise of its safe storage and future return. Conversely, the United States held the burden of storing the property in exchange for the benefit of using it. Although there was no explicit bargained for exchange, these elements could be inferred from the parties' conduct.

Therefore, the Plaintiffs have raised sufficient facts to survive the motion to dismiss. However, to prevail on the merits the Plaintiffs must be able to establish that all contract elements have been satisfied. Because a threshold fact for a bailment claim is the identification of the specific property that is the subject of the bailment, the Plaintiffs must also "identify those specific items on the Gold Train that form the basis of a contract for bailment between the Plaintiffs and the Government." *August 28, 2002 Order* at 17, n.23.

## II. *The Administrative Procedure Act § 701(b)(G)*

The Defendant requests that the Court clarify its August 28th Order to reflect that the Plaintiffs must retain the burden of establishing that the U.S. military's actions in connection to the Gold Train were not pursuant to "military authority." Persons injured by agency action are entitled to judicial review of their claims. *See* 5 U.S.C. § 702 (West 2002). However, Congress explicitly precluded from judicial review "military authority exercised in the field in time of war or in occupied territory..." 5 U.S.C. § 701(b)(1)(G) (West 2002).

The Plaintiffs' complaint alleges that the actions took place in occupied territory: "[a]fter the war General Harry J. Collins was in charge of the occupation of Austria." *Complaint* at 26, ¶ 71, and that military officers "requisitioned"[4] property through proper military protocol. *See id.* at 27, ¶ 72 During oral argument on the Motion to Dismiss, however, Plaintiffs suggested that facts exist to show that the Government's actions were non-military in nature. *See also August 28, 2002 Order* at 13. In an abundance of caution, the Court will permit the Plaintiffs to prove that the army's actions were not made pursuant to the APA's "military authority" exception and thus that there was a waiver of the United States' sovereign immunity.

---

**3.** The Plaintiffs alleged that the United States military (1) accepted possession of Plaintiffs' property with the express knowledge that the property belonged to Plaintiffs; (2) never claimed to be the owner of the property; (3) took possession of the property with the express intent of undertaking to return the property to its rightful owners; (4) stored and guarded the property in warehouses for protection so that it could be returned to its rightful owners; (5) indicated, expressly and through applicable laws, that any identifiable

property from the Gold Train would be returned in accordance with U.S. policy and custom; and (6) falsely declared that the property was unidentifiable, thus breaching the agreement. *See August 28, 2002 Order* at 17.

**4.** One definition of requisition is: "the act of requiring something to be furnished... as (1) a demand made by military authorities upon civilians for supplies or other needs..." *Merrian–Webster's Collegiate Dictionary*, 995 (10th ed.1998).

Discovery on this issue is critical because of the fact-intensive nature of this inquiry necessary to permit the Court to determine if it has jurisdiction over the non-monetary claims. The Court notes that the United States District Court for the District of Columbia has recently stated that it could find no legislative history on the military-authority exception and that there was "an absence of pertinent case law." *Rasul v. Bush,* 215 F.Supp.2d 55, 64 n. 11 (D.D.C.2002). Thus, culling the facts to answer this jurisdictional issue is essential. For the above stated reasons, it is hereby

ORDERED that the United States' Motion for Partial Reconsideration is DENIED.

IT IS FURTHER ORDERED that discovery will proceed as follows:

### (1) *Jurisdictional Issues*

(a) The Plaintiffs have the burden to show that the army's actions were not pursuant to the APA's military-authority sovereign immunity exclusion. If the Plaintiffs cannot meet this burden, then the Court lacks subject-matter jurisdiction on the international law violation claim.[5]

(b) The Plaintiffs must identify individual ownership of specific Gold Train property and thus show whether equitable tolling applies and the implied-in-fact contract for bailment claim can proceed.

### (2) *Discovery on Contract Formation and Remaining Issues*

Discovery on contract formation and any remaining issues will proceed following the Court's resolution of the above jurisdictional issues.

IT IS FURTHER ORDERED that by **December 13, 2002** the Parties shall submit a revised joint scheduling report providing agreed upon dates for Part I discovery and briefing of the remaining jurisdictional issues.

---

**5.** The August 28th Order dismissed the Little Tucker Act and Alien Torts Act as jurisdictional routes to entertain the international law violation claims. *August 28, 2002 Order* at 10–12.